IN THE UNITED STATES COURT FOR THE DISTRICT OF UTAH

CENTRAL DIVISION

| | |
|---|---|
| TAMARA SMITH,<br><br>    Plaintiff,<br><br><br><br>            vs.<br><br><br><br>SALT LAKE CITY CORPORATION (Salt Lake City Police Department),<br><br>        Defendant. | ORDER GRANTING MOTION FOR SUMMARY JUDGMENT<br><br><br><br><br><br><br>Case No. 2:05cv00943 |

Tamara Smith worked as a dispatcher for the Salt Lake City Police Department (SLC) beginning in 1998.  SLC fired Ms. Smith in 2003, citing her repeated policy violations.  After the Civil Service Commission supported SLC's termination of Ms. Smith, Ms. Smith filed a complaint with this court alleging that SLC violated the Americans with Disabilities Act by firing her due to a disability and refused to grant reasonable accommodations to her.  Ms. Smith also argues that this court should draw negative inferences against SLC due to SLC's alleged spoilation of evidence.  But from the evidence presented, no reasonable juror could find SLC fired Ms. Smith for any reason other than that she repeatedly violated SLC policies.  In other words, Ms. Smith simply has provided no evidence tending to show discrimination based on her disability formed the basis for her termination.  In addition, she provided no evidence that she

informed SLC of any limitations or need for an accommodation in performing her job duties.

The court, therefore, grants summary judgment to SLC on both of Ms. Smith's claims.

## BACKGROUND

When considering a motion for summary judgment, the court views the evidence in the light most favorable to the nonmoving party.[1]  Viewed in this light, the record reflects the following facts.

Ms. Smith worked for the Salt Lake City Police Department (SLC) as a dispatcher from March 1998 through November 2003.  Throughout the course of her employment, SLC documented and disciplined Ms. Smith for multiple policy violations.

Many of Ms. Smith's policy violations related to timeliness and attendance.  SLC first recorded a policy violation by Ms. Smith on March 5, 1999.  At this time, SLC extended Ms. Smith's probationary period because she had failed to complete her POST application in a timely manner.  As a result of this violation, SLC subjected Ms. Smith to an "instructional interview." On April 6, 2001, SLC gave Ms. Smith a written warning for taking excessive time off without pay.  On February 6, 2001, SLC issued Ms. Smith a letter which contained a "verbal warning" for being late to work.  SLC issued Ms. Smith another letter containing a verbal warning on August 12, 2002 — this time for violating SLC's attendance and time-off policy.  On a merit evaluation from 2002, Ms. Smith's supervisor rated her performance as unsatisfactory in the category of "observance of work hours."

_____

[1] *See Cortez v. McCauley*, 438 F.3d 980, 988 (10th Cir. 2006).

In addition to timeliness and attendance issues, SLC disciplined Ms. Smith for multiple violations of computer-use policies.  In April 2002, Ms. Smith attended a "training interview" for sending, via e-mail, a picture that SLC deemed inappropriate.  SLC issued a letter to Ms. Smith regarding this violation, on April 12, 2001.  The letter indicated that Ms. Smith had attended a pre-disciplinary interview and had received training regarding the proper use of the e-mail system and the information appropriate to transmit.  Ms. Smith admitted to violating SLC's e-mail policy and admitted she had received the letter of April 12, 2001.

SLC issued another letter to Ms. Smith on January 21, 2002.  This letter referred back to Ms. Smith's training interview in April 2001, and noted that Ms. Smith had again violated the computer-use policy.  Ms. Smith admitted this January 2002 incident constituted a policy violation.

SLC issued Ms. Smith yet another warning for violating the computer-use policy, on November 22, 2002.  This letter referenced the unacceptable nature of the e-mail messages Ms. Smith sent and received.  It noted such transmissions opened Ms. Smith, her supervisors, and SLC to potential liability.  The letter also pointed to Ms. Smith' two prior violations of the computer-use policy and warned that "[f]urther instances of this can result in progressive discipline, up to and including termination."[2]

Ms. Smith testified that she had, indeed, violated the policy in November 2002.  Further, she was aware that additional violations could result in her termination.  Nonetheless, Ms. Smith

---

[2] Mem. in Support of Mot. for Summ. J., Ex. E, Docket No. 19.

again violated the policy.  On July 21, 2003, SLC issued a "written reprimand" to Ms. Smith for

violating SLC's computer-use protocol again.  Ms. Smith agreed with the discipline and noted

that her conduct constituted a blatant violation of the policy.  SLC's letter to her stated: "This is a

last attempt to stop this behavior.  Any additional violations will be subject to progressive

discipline, starting with time off, and/or leading to termination of your employment with Salt

Lake City Corporation."[3]  Ms. Smith acknowledged her receipt of this letter on July 28, 2003.

Despite these multiple disciplinary letters for violations of SLC's computer policy, Ms.

Smith continued to send policy-violating messages.  On July 21, 2003 (the same day SLC issued

a written reprimand for a different violation), Ms. Smith sent a co-worker an insulting e-mail,

which SLC deemed "obscene" and "hateful."[4]  The Civil Service Commission found the same e-

mail to be "threatening."[5]  In the e-mail, Ms. Smith said such things as "go ahead and fuck him,"

"your boobs are made of water," and "YOU['RE] A BITCH!"[6]  Ms. Smith admitted the e-mail

was inappropriate.  In addition, Ms. Smith admitted she had sent about ten e-mails regarding the

same issue to the same co-worker.  At the time Ms. Smith sent this e-mail, she was away from

work on short-term disability leave.  But SLC employees can access the SLC e-mail system to

send e-mail from non-SLC computers — Ms. Smith used this access to send this "hateful" e-mail

to her co-worker.

---

[3] Mem. in Support of Mot. for Summ. J., Ex. F, Docket No. 19.

[4] Jensen Aff., Ex. 6, 7, Docket No. 22.

[5] Mem. in Support of Mot. for Summ. J., Ex. M, Docket No. 20.

[6] Jensen Aff., Ex. 7, Docket No. 22.

At the time Ms. Smith sent this e-mail, she had been on short-term disability leave since May 27, 2003.  On May 26, 2003, Ms. Smith was seen at the University Medical Center.  The next day, SLC cleared Ms. Smith for leave pursuant to the Family Medical Leave Act.  SLC also cleared her for short-term disability insurance.  On July 22, 2003, the day after Ms. Smith sent this hateful e-mail, Tracy Vaneps, SLC's Human Resource Director, wrote a letter to Ms. Smith's physician, Dr. Duane Banks.  In her letter she inquired:

1.    Is Ms. Smith a danger to herself?
2.    Is Ms. Smith a danger to other people?
3.    Dispatching is a stressful job.  Is Ms. Smith able to perform her duties as a dispatcher without causing her additional undue stress and/or putting officers or citizens in jeopardy?[7]

On July 23, 2003, Dr. Banks responded:

[Ms. Smith] suffers from borderline personality disorder and depression. She is currently not a danger to herself or others.  It is common for clients with this disorder to suffer from reactive moods which may include becoming suicidal.[8]

Dr. Banks continued by explaining that he does not perform functional assessments.  Instead, he advised SLC to rely on Ms. Smith's five-year work history and job performance as the "best indicator" of her ability to handle her job.  Dr. Banks concluded, "I think it is fine for her to return to work."[9]

But Ms. Smith's documented policy violations did not end with the hateful e-mail.  About

---

[7] Smith. Aff., Ex. 1, Docket No. 23.

[8] Smith Aff., Exh. 2, Docket No. 24.

[9] *Id.*

one month after sending the e-mail to her coworker, Ms. Smith forwarded a sexual e-mail to fifteen of her fellow employees.  This e-mail, entitled "Mr. P.P. Head," contained multiple cartoon drawings of penises, each accompanied by a caption.  Ms. Smith admitted she forwarded the e-mail and that it was part of the reason she was terminated.

Ms. Smith's supervisor became aware of this final e-mail after finding a printed copy in his mailbox slot.  Attached to the e-mail was a note saying, "I find this offensive and don't want this crap sent to me.  Thank You."[10]  This note was unsigned.  Ms. Smith's supervisor, believing the e-mail may have violated SLC's sexual harassment policy, forwarded the e-mail to his boss.  On September 26, 2003, as part of an internal investigation, a detective from SLC's Internal Affairs Division questioned Ms. Smith about the "Mr. P.P. Head" e-mail.  During this conversation, Ms. Smith admitted to knowing of the sexual harassment policy at SLC.  She agreed the policy dealt with how "a comment that could be interpreted — basically it is not the intent of how it was sent but how it was perceived by who received it."[11]  Ms. Smith even referred to a specific section of the sexual harassment policy as the section she violated with the e-mail.

SLC terminated Ms. Smith's employment on November 17, 2003.  In a termination letter, Police Chief C.F. Dinse explained Ms. Smith has been terminated due to her policy violations, especially those related to computer messaging and sexual harassment.  Chief Dinse noted that he

---

[10] Mem. in Support of Mot. for Summ. J., Ex. I, Docket No. 20.

[11] Mem. in Support of Mot. for Summ. J., Ex. K, Docket No. 20.

had considered Ms. Smith's entire work history in making his decision, including her positive commendations. Ultimately, however, because of Ms. Smith's repeated violations, Chief Dinse found termination to be warranted.

Ms. Smith appealed her termination to the Civil Service Commission. During her appeal, Ms. Smith requested e-mail-related information from SLC. Apparently, she hoped to obtain sender and receiver information for the "Mr. P.P. Head" e-mail as well as other e-mail records. The CSC ordered certain e-mail information to be turned over to Ms. Smith. SLC's attorney requested the information from SLC on February 18, 2004. But SLC was not able to provide the specific e-mail history SLC requested. Ms. Smith attributes this to SLC's change in policy. On February 25, 2004, an SLC information technology technician sent an e-mail noting SLC's lack of compliance with Salt Lake City Corporation's e-mail policy. Apparently, some users' settings resulted in deleted e-mail being placed in a folder instead of being actually deleted. But Salt Lake City's policy required e-mails to be totally and permanently removed from all systems upon deletion, unless a user requested a different action. To comply with this policy, SLC set automatic deletion of e-mails as the departmental default, unless individual employees requested otherwise. The new policy went into effect on March 5, 2004.

The CSC held a hearing in Ms. Smith's case on October 22, 2004. At that hearing, Ms. Smith was represented by an attorney, she called witnesses to testify, and she testified. In accordance with the parties' stipulation, the court treats witness testimony given during this

hearing as prior sworn testimony.[12]  The CSC issued a decision on February 17, 2005, explaining that Ms. Smith's termination was justified and that Ms. Smith's conduct constituted a clear and obvious violation of SLC policies.

Rather than appeal the CSC's decision to the Utah Court of Appeals, Ms. Smith filed this suit.  In her complaint, Ms. Smith alleges SLC violated the Americans with Disabilities Act by wrongfully terminating her and refusing to reasonably accommodate her.  During her deposition, SLC questioned Ms. Smith about her refusal-to-accommodate claim.  Ms. Smith admitted she had no problems performing her job at SLC.  She maintained that her personality disorder in no way prevented her from doing any part of her job.  In fact, Ms. Smith claimed she excelled at her job and that her personality disorder only affected her work at SLC positively by increasing her desire to do a good job.  Ms. Smith also testified that SLC needed to do nothing special to allow her to do her job and she explained that she never requested SLC do anything differently to allow her to do her job.

### STANDARD OF REVIEW

The court should grant summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."[13]  In determining the appropriateness of summary judgment, the court must "view the

---

[12] *See* Joint Mot. Regarding Discovery Issues 2, Docket No. 11.

[13] Fed. R. Civ. P. 56(c).

evidence, and draw reasonable inferences therefrom, in the light most favorable to the non-moving party."[14]  However, "[t]he mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient [to overcome a motion for summary judgment]; there must be evidence on which the jury could reasonably find for the plaintiff."[15]

### DISCUSSION

Ms. Smith contends SLC discriminated against her in violation of the Americans with Disabilities Act by failing to provide her with reasonable accommodations and by wrongfully terminating her.  The ADA prohibits employers from terminating employees because of their disabilities.[16]  The ADA's general proscription is that:

> No covered entity shall discriminate against a qualified individual with a disability because of the disability of such individual in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment.[17]

The court finds the evidence presented by Ms. Smith insufficient to defeat summary judgment on either of her ADA claims.

*(1)     Reasonable Accommodation Claim*

Although Ms. Smith's complaint only listed one cause of action, if stretched, it can be read to include a failure-to-accommodate claim under the ADA.  The term "discriminate" under

---

[14] *Combs v. PriceWaterhouse Coopers, LLP*, 382 F.3d 1196, 1199 (10th Cir. 2004).

[15] *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986).

[16] *See* 42 U.S.C. § 12112(a).

[17] *Id.*

the ADA includes:

> not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is an applicant or employee, unless such covered entity can demonstrate that the accommodation would impose an undue hardship on the operation of the business of such covered entity.[18]

The court invokes the burden-shifting framework of *McDonnell Douglas* in ADA failure-to-accommodate cases.[19] But the purpose of this approach in the ADA context is to provide structure to courts considering motions for summary judgment rather than to evaluate the intent of the employer.[20] Under this framework, to survive summary judgment, the employee must initially show that she is disabled within the ADA's meaning, then that she "has made any resulting limitations from . . . her disability known to the employer."[21]

The notice component of a failure-to-accommodate claim is important. Although the ADA envisions an interactive process between employers and employees regarding appropriate reasonable accommodations,[22] "[t]he ADA does not require clairvoyance."[23] The interactive process, therefore, must "begin with the employee providing notice to the employer of the employee's disability and any resulting limitations, and expressing a desire for reassignment if no

---

[18] *Id.*

[19] *Smith v. Midland Brake, Inc.*, 180 F.3d 1154, 1178 (10th Cir. 1999).

[20] *Id.* at 1179 n.12.

[21] *Id.*

[22] *See* 129 C.F.R. § 1630.2(o)(3); *Midland Brake*, 180 F.3d at 1171.

[23] *Hedberg v. Ind. Bell Tel. Co.*, 47 F.3d 928, 934 (7th Cir. 1995).

reasonable accommodation is possible in the employee's existing job."[24]  This duty to inform the employer is "a duty dictated by common sense lest a disabled employee keep his disability a secret and sue later for failure to accommodate."[25]

In this case, even assuming (without deciding) that Ms. Smith is disabled within the meaning of the ADA, Ms. Smith failed to establish a prima facie case of failure to accommodate. The evidence she provided is insufficient for a reasonable juror to find that she made her disability or any resulting limitations known to SLC.  SLC was aware Ms. Smith took short-term disability leave.  But even if this awareness provided SLC with notice Ms. Smith faced some sort of disability, it provided SLC with no notice of the severity of the disability or how it limited her performance (if at all).  The letter by Tracy Vaneps is no different.  Ms. Vaneps' letter reveals SLC's knowledge that Ms. Smith was a patient of Dr. Banks, and reveals concern with Ms. Smith's behaviors, but it does not establish knowledge of a disability within the meaning of the ADA or of limitations caused by any such disability.  Indeed, the fact that Ms. Vaneps wrote the letter indicates her lack of knowledge about Ms. Smith's disability or limitations from it.  Dr. Banks' letter is similarly unhelpful to Ms. Smith.  Although Dr. Banks' letter advised SLC that Ms. Smith suffered from borderline personality disorder and depression, it did not indicate that Ms. Smith would face any work limitations from these problems.  Instead, Dr. Banks simply advised SLC to look to Ms. Smith's past performance as indicative of her ability to perform her

---

[24] *Midland Brake*, 180 F.3d at 1171.

[25] *Beck v. Univ. of Wis.*, 75 F.3d 1130, 1134 (7th Cir. 1996).

job.  In fact, Dr. Banks opined that it would be fine for Ms. Smith to return to work.  Further, the letter never mentioned a need for accommodations.

Even Ms. Smith's own testimony does not support her failure-to-accommodate claim.  In her deposition, Ms. Smith never testified she notified SLC of her disability or of any limitations it caused.  Instead, to the contrary, Ms. Smith testified that she needed no accommodations at all and she had never requested any accommodations from SLC.  She also explained that she had no problems performing her job and her disability helped her to excel in her position.  In her motion, Ms. Smith contends these statements are inadmissible conclusions of law.  But the court finds them to be admissible, factual statements about her work situation.

In sum, based on the evidence described above, no reasonable juror could find the evidence Ms. Smith presented to be sufficient to establish SLC's knowledge of any disability-related limitations by Ms. Smith.  This is fatal to Ms. Smith's failure-to-accommodate claim.  The court, therefore, grants summary judgment to SLC on this claim.

*(2)    Discrimination Claim*

In addition to her failure-to-accommodate claim, Ms. Smith alleges SLC discriminated against her by terminating her because of her disability.  In absence of direct evidence of discrimination, the court assesses ADA discrimination claims under the *McDonnell Douglas* burden-shifting framework.[26]  Under this burden-shifting structure, the plaintiff must first

---

[26] *Morgan v. Hilti, Inc.*, 108 F.3d 1319, 1323–34 (10th Cir. 1997).

establish a prima facie case of disability discrimination.[27]  Then the burden shifts to the employer

to articulate a legitimate, nondiscriminatory reason for the adverse employment decision.[28]  From

there, the burden returns to the plaintiff to show the stated reason is pretextual.[29]

To meet her prima facie burden for discrimination under the ADA, a plaintiff must

establish that: "(1) she is a disabled person within the meaning of the ADA; (2) she is qualified to

perform the essential functions of the job, with or without accommodation; and (3) the employer

terminated her employment under circumstances which give rise to an inference that the

termination was based on her disability."[30]  "At all times, the plaintiff retains the ultimate burden

of proving such discrimination."[31]

For the purpose of its motion for summary judgment only, SLC assumed Ms. Smith could

present sufficient evidence to establish a prima facie case of discrimination with regard to her

termination.  Therefore, although Ms. Smith argues prima facie issues, the court need not and

does not address them.  Instead, the court also assumes (without deciding) that Ms. Smith could

establish a prima facie case.  This shifts the burden to SLC to articulate a legitimate,

nondiscriminatory reason for firing Ms. Smith.  SLC has consistently justified its actions by

citing Ms. Smith's repeated and documented policy violations.  With this explanation, SLC has

---

[27] *Id.* at 1323.

[28] *Id.*

[29] *Id.*

[30] *Bones v. Honeywell Int'l, Inc.*, 366 F.3d 869, 878 (10th Cir. 2004).

[31] *Selenke v. Med. Imaging*, 248 F.3d 1249, 1259 (10th Cir. 2001).

met its burden — this proffered reason is both legitimate and nondiscriminatory.  At this point, therefore, "the presumption of discrimination established by the prima facie showing simply drops out of the picture."[32]

This leaves the last prong of the *McDonnell Douglas* framework for the court to address — Ms. Smith's burden to show SLC's proffered reason for the termination is pretextual.  To defeat summary judgment at this stage of the framework, Ms. Smith would need to establish the existence of a genuine dispute as to pretext.  Ms. Smith has not done so.  In an attempt to meet her burden, Ms. Smith argues the court must draw inferences in her favor under the spoliation doctrine.  This contention fails to save Ms. Smith's pretext argument.

### 1.      Claim of Pretext

If Ms. Smith were able to demonstrate SLC's stated reasons for terminating her were pretextual, it would get her "over the hurdle of summary judgment."[33]  "Pretext can be shown by 'such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employers' proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence and hence infer that the employer did not act for the asserted non-discriminatory reasons.'"[34]  But "'[m]ere conjecture that [the] employer's explanation is a

_____

[32] *Aramburu v. Boeing Co.*, 112 F.3d 1398, 1403 (10th Cir. 1997) (citation and internal quotations omitted). .

[33] *Morgan*, 108 F.3d at 1323 (citation and internal quotations omitted).

[34] *Id.* (quoting *Olson v. Gen. Elec. Astrospace*, 101 F.3d 947, 951–52 (3d Cir. 1996)).

pretext for intentional discrimination is an insufficient basis for denial of summary judgment.'"[35] Further, when assessing a claim of pretext, the court examines the facts "'as they appear to the person making the decision to terminate [the] plaintiff.'"[36]  The relevant question is whether the reason the employer articulated is the real reason for the employer's action.[37]

No reasonable jury could find the evidence Ms. Smith presented sufficient to support a finding of pretext.  SLC took disciplinary measures against Ms. Smith for violations of timeliness and attendance policies five times during the course of her five-year employment.  SLC disciplined her four times for violations of computer policies.  Two of those violations led SLC to warn Ms. Smith she may be terminated for future violations.  Despite these warnings, Ms. Smith violated the computer policies twice more and violated the sexual harassment policy once. Only then did SLC fire her.  Ms. Smith offers no evidence rebutting SLC's evidence that she violated various policies or that she specifically violated computer-use policies at least six times during the court of her employment.  She does not rebut that SLC took disciplinary action against her for these violations or contest the accuracy of SLC's record of her policy violations.  Finally, Ms. Smith does not rebut that her misconduct continued.  Rather, Ms. Smith challenges SLC's contention that it terminated Ms. Smith on these grounds instead of on the basis of her disability and she argues that she was a good employee in other ways.

---

[35] *Id.* (quoting *Branson v. Price River Coal Co.*, 853 F.2d 768, 772 (10th Cir. 1988)).

[36] *Selenke*, 248 F.3d at 1260 (quoting *Kendrick v. Penske Transp. Servs., Inc.*, 220 F.3d 1220, 1231 (10th Cir. 2000)).

[37] *Id.* at 1261 (citations omitted).

As the basis for her claim that SLC terminated her because of her disability rather than her policy violations, Ms. Smith contends that SLC did not discharge similarly-situated non-disabled employees who violated comparably serious rules.  Although a "satisfactory showing that similarly situated employees, who do not belong to the protected class, were treated differently with regard to violation of a work rule could have lent support to the pretext argument,"[38] Ms. Smith failed to make a satisfactory showing.  In support of her allegations that supervisors' and others employees' conduct was more egregious than hers, Ms. Smith claims SLC disciplined Sgt. Scott White and other employees less severely than it disciplined her, even though these employees sent e-mails that were allegedly more sexually offensive.  In support this claim, however, Ms. Smith has offered only copies of e-mails purportedly sent by other co-workers, without actually proving that they were, in fact, sent by her co-workers.  Moreover, she has failed to produce any evidence that SLC was aware of these offensive e-mails.  Finally, she has not shown the disability status and disciplinary track records of these employees.  Without proof of such points, she is left with mere speculation about possible differential treatment rather than any evidence it took place.  That is not enough to survive summary judgment.   In other words, the requirement that the court draw inferences in favor of the nonmoving party at the summary judgment stage does not allow the court to assume — in the absence of evidence — that the employees Ms. Smith refers to were non-disabled employees who were otherwise similarly situated.   In short, Ms. Smith has presented no evidence SLC treated her differently

---

[38] *Morgan*, 108 F.3d at 1324.

from other non-disabled employees with similar policy violations.

Ms. Smith also argues her termination was pretextual because even though she frequently violated policies, she was a good employee in other ways. For instance, Ms. Smith repeatedly asserted that since she received recognition as the Trainer of the Year in SLC in 2002, "conduct prior to 2003 should be viewed with little weight [and] . . . her recognition should be viewed highly."[39] Ms. Smith repeated this refrain in response to many factual statements of SLC, in the guise of disputing the facts. But the statement is unresponsive to facts — it does not dispute the evidence that Ms. Smith repeatedly violated SLC's policies. Moreover, even though the record shows Ms. Smith received multiple commendations throughout the course of her employment, SLC is not required to retain even an otherwise excellent employee if the employee consistently violates policies despite repeated warnings and threats of termination. In one disciplinary letter, SLC noted its concern that Ms. Smith's behavior opened it up to liability. And one employee had complained about Ms. Smith's conduct by way of an anonymous note attached to a copy of the "Mr. P.P. Head" e-mail. From the vantage point of SLC, it was unwise to retain any employee who repeatedly exposed SLC to liability in this manner, despite the number of commendations she received. Nothing Ms. Smith has provided suggests this was a pretext.

Additionally, Ms. Smith cites to the timing of her termination as evidence that SLC fired her because of her disability. While timing is relevant to whether an employer's explanation is pretextual, the Tenth Circuit has "refused to allow even very close temporal proximity to operate

---

[39] *See, e.g.*, Memo. in Opp'n 5.

as a proxy for th[e] evidentiary requirement that the plaintiff demonstrate pretext."[40]   Therefore, close temporal proximity alone is insufficient to defeat summary judgment at the pretext stage of the *McDonnell Douglas* framework.[41]

Ms. Smith's timing argument relates to Dr. Banks' letter.  In particular, Ms. Smith argues the letter stigmatized her and led to her ultimate termination.  On July 22, 2003, the day after Ms. Smith sent hateful e-mail to a coworker, Ms. Vaneps requested information from Dr. Banks about Ms. Smith's ability to perform her job, and any threats she posed to herself or others.  Ms. Vaneps' letter reveals concern because of Ms. Smith's conduct (undoubtedly, including the hateful e-mail) over the previous couple of days.  Dr. Banks responded with notice of Ms. Smith's depression and personality disorder on July 23, 2003.  SLC terminated Ms. Smith on November 17, 2003 — nearly four months later.  Four months is not such a close proximity that it justifies an inference of pretext.  This is especially true where, within the same four months, Ms. Smith sent the hateful e-mail and also sent the "Mr. P.P. Head" e-mail to fifteen of her co-workers.  SLC conducted an internal investigation into this conduct over the course of a couple months.  An Internal Affairs detective interviewed Ms. Smith on September 26, 2003, and Ms Smith attended pre-disciplinary hearings with regard to these violations on November 10, 2003.  This chronology of events shows Ms. Smith's November 17th termination correlates with the investigation into her policy violations rather than with the letter from Dr. Banks.

---

[40] *Metzler v. Fed. Home Loan Bank*, 464 F.2d 1164, 1172 (10th Cir. 2006).

[41] *Annett v. Univ. of Kan.*, 371 F.3d 1233, 1240–41 (10th Cir. 2004)

Finally, a number of Ms. Smith's claims seem to relate to the sufficiency of the proceeding before the CSC.  For instance, Ms. Smith complains about the CSC's unwillingness to allow her to present evidence of her disability as a defense at the CSC hearing.  She argues this led to one-sided CSC findings.  Even if true, the court fails to see how this supports Ms. Smith's claims in this ADA lawsuit.  And since this is not an appeal from the CSC decision (nor the appropriate place to make such an appeal), the court does not address these claims of error.

In sum, a reasonable jury could only find SLC terminated Ms. Smith for repeated, well-documented policy violations that continued despite SLC's warnings that Ms. Smith may be terminated if her misconduct continued.  In light of the record evidence, no reasonable jury could conclude SLC's  nondiscriminatory reasons for Ms. Smith's termination masked discriminatory intent.  In other words, Ms. Smith has failed to establish that her termination was *based on* her disability by pointing to any implausibilities, inconsistencies, or contradictions in SLC's course of conduct.

2.      Evidence Spoilation

Ms. Smith's claims of evidence spoilation fail to save her pretext arguments.  Ms. Smith argues SLC destroyed evidence that would have shown SLC acted in an arbitrary manner against her with regard to the "Mr. P.P. Head" e-mail.  This arbitrary treatment, according to Ms. Smith, would be circumstantial evidence that Ms. Smith's health condition was the true motive behind her termination.  Due to SLC's alleged evidence destruction, Ms. Smith claims the court should draw a negative inference against SLC (effectively, a favorable inference for Ms. Smith) pursuant to the spoilation doctrine.

Ms. Smith cites no Tenth Circuit cases supporting the application of the spoilation doctrine in this matter.  Essentially, under the spoilation doctrine, "bad faith destruction of a document relevant to proof of an issue at trial gives rise to an inference that production of the document would have been unfavorable to the party responsible for its destruction."[42]  A finding of bad faith by the party destroying the evidence is necessary to apply an adverse inference.[43]

Ms. Smith's contention that the spoilation doctrine applies in this case fails on a number of grounds.  The first problem is that she has offered no evidence that SLC actually destroyed any records — she has offered no evidence the records *even existed* at the time of her request. During the CSC proceedings, Ms. Smith requested the history of the e-mails she sent, as well as the e-mail history of various employees.  The CSC ordered SLC to provided that history. Specifically, on February 18, 2004, the senior city attorney requested a forensic team to seize and analyze the computers of nine employees.  Ms. Smith received nothing in response to this request.  She attributes the lack of evidence to the fact that on February 25, 2004, an SLC information technology technician sent an e-mail noting its lack of compliance with Salt Lake City Corporation's e-mail policy.  Apparently, some users' settings resulted in deleted e-mail being placed in a folder instead of being actually deleted.  But Salt Lake City's policy required e-mails to be totally and permanently removed from all systems upon deletion, unless a user requested a different action.  Effective March 5, 2004, to comply with this policy, SLC set

---

[42] *Aramburu*, 112 F.3d at 1407.

[43] *Id.*

automatic deletion of e-mails as the departmental default, unless individual employees requested otherwise.

Ms. Smith's argument that SLC necessarily destroyed evidence due to this policy change assumes too much.  Ms. Smith sent the e-mail at issue on August 23, 2003.  Only if the employees Ms. Smith named failed to delete the e-mail between August and February — a six-month time frame — would the evidence even have existed for SLC to recover.  Ms. Smith offered no evidence any of the employees had kept any offending e-mails so long — without this evidence, the court is unable to infer SLC destroyed known and certain evidence.  In other words, Ms. Smith has failed to establish there was any kind of a reasonable chance the evidence even existed at the time she made the request.

Any failure of SLC to retain the e-mail history itself before this date cannot be considered wrongful because there is no evidence SLC had identified anyone having information relevant to Ms. Smith's case before Ms. Smith's request.  SLC would have no reason to think, as of August 2003, that the e-mail records of various unrelated employees may be relevant to any type of litigation by Ms. Smith, or even relevant to her CSC appeal.  Indeed, Ms. Smith requested the evidence a full eighteen months before she filed suit in this case.  Thus, SLC cannot be said to have been on notice of the need to retain the evidence.

Second, Ms. Smith has failed to show bad faith on the part of SLC — a necessary finding for the assignment of an adverse inference under the spoilation doctrine.[44]  For one thing, the

---

[44] *Id.*

uncertain existence of the records undermines a showing of bad faith destruction.  If the records did not exist at the time SLC changed its e-mail policy, it is difficult to imagine the policy alteration reflected a bad-faith attempt to destroy them.  Further, it is legitimate for SLC to change policies to bring itself into compliance with the requirements of its "parent," Salt Lake City Corporation.  For another thing, the ability of employees to keep deleted e-mails (to "opt-out" of the default setting) undermines any showing of bad faith.  The employees themselves could have kept the e-mails, if they so desired.  Any inference of bad faith is further undercut by the large number of other records SLC did produce.  For example, SLC provided evidence related to the individuals SLC disciplined for violations of the computer policies, each inappropriate e-mail seized over the prior two years, and each e-mail-related policy of SLC.  In support of her bad faith argument, Ms. Smith cites to some language from an opinion of this court regarding a defendant's motive to conceal negative information.[45]  But this language relates to the court's consideration of the adequacy of allegations of fraud — it has nothing to do with evidence spoilation or bad faith.  As such, it is inapplicable here.

Finally, even if Ms. Smith had shown the records existed and had established bad faith on the part of SLC, her claim would still fail because she has neglected to establish the relevance of the records.  Ms. Smith alleges the records would have shown other employees were involved in the same conduct as Ms. Smith but SLC treated them differently.  The flaw in Ms. Smith's theory is that unless SLC *knew* other employees were violating e-mail policies, SLC cannot be said to

---

[45] *See Oppenheimer v. Novell, Inc.*, 851 F. Supp 412, 417 (D. Utah 1994).

have treated employees differently.  If SLC did not know an employee had violated a policy, it would have no basis for disciplining the employee.  In other words, even assuming the uncertain e-mail evidence established that other employees violated SLC's computer-use policies more egregiously than Ms. Smith, Ms. Smith has offered no evidence tending to show SLC knew of any such violations.  Indeed, she has not even alleged such knowledge.  Without evidence SLC knew of other employees' violations and took less action against them, Ms. Smith's hoped-for evidence would be irrelevant to a showing of pretext.

Ms. Smith, therefore, has not shown herself to be entitled to a favorable inference under the spoilation doctrine.  And because a reasonable juror could only find SLC terminated Ms. Smith for reasons unrelated to a disability, Ms. Smith's cause of action for disability discrimination fails.  The court, therefore, grants summary judgment to SLC on Ms. Smith's wrongful termination claim.

## CONCLUSION

Based on the foregoing, the court GRANTS SLC's motion for summary judgment on all claims [# 17].  The clerk's office is directed to enter judgment accordingly and to close the case.

DATED this 20th day of February, 2007.

BY THE COURT:

_____
Paul G. Cassell
United States District Judge